The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. This is the time and place set for the argument in Hunt v. Zuffa. Mr. Hunt, can you hear us? Yes, Your Honor, I can hear you. All right, you may proceed. Good morning. My name is Mark Hunt. I'm representing myself. Now, I please the court. My partner Fleur is here to assist me if required. The overarching basis of this appeal is in two parts. Part one is that the district court erred in their decisions. Its summary judgment, for the many reasons demonstrated in my briefs, and that the district court should have identified that my former counsel's lawyering was so far outside of the norm that it would be found to be inexcusable to have ignored the egregious incompetence, gross negligence, and misconduct. Part two is the egregious incompetence, gross negligence, and misconduct by a former counsel. So, Mr. Hunt, I hate to interrupt you, but here today we cannot rule on whether or not your attorneys were competent in representing you. So what we're here for today is for you to tell us what evidence there was in the record that supported your argument that there was fraud perpetrated upon you and that you were the victim of a battery in the ring. That's where we're focusing today. Can I just say one quick thing, just, Mr. Hunt? You know, normally in a civil case, if you think your lawyer let you down, your remedy is to deal with your lawyer. And that means that you have remedies, you may have remedies. I'm not saying you do. I offer no opinion on that against your lawyer. But in a civil case, judges don't treat parties differently or give them a second bite at the apple because the lawyer that a person chose hypothetically may have done a poor job. That doesn't mean you don't potentially have a remedy. In a criminal case, things can be different because you're dealing with more significant issues involving loss of freedom. So I just wanted just to educate you a little bit on that issue. So forgive the interruption. So, Mr. Hunt, could you tell us what in the record supports your claim that there was fraud perpetrated against you? In the answering brief, all the admissions of collusion, fraud, aiding and abetting, affirmed Hunt was damaged to his detriment, misleading practices, derivative aiding and abetting, assisted and encouraging Lesner to ban substance use. These were all admitted in their submissions in their answering brief. Sorry. Perhaps it would help if we heard from opposing counsel and then you can come back and respond to what they said. Is that agreeable to you? Yes, Your Honor. Go ahead. If you have something else you'd like to tell us, please. I was just about to reserve the rest of my time for rebuttal. Oh, all right. All right. Thank you, counsel. I mean, thank you, Mr. Hunt. All right. Good afternoon, Your Honors. May it please the Court, my name is Colby Williams. I represent ZUFA LLC, which does business as the Ultimate Fighting Championship. You may hear me refer to it as the UFC. I also represent Defendant Dana White, the company's president. And I give Mr. Hunt credit for taking on the task of trying to argue pro se in front of an appellate court in this country. It's a very difficult task and it's emblematic, I think, of his fighting spirit and his colorful personality that made him such a good fighter. But with all due respect, a colorful personality and a great fighting spirit is not enough to undo this summary judgment record. Mr. Hunt repeatedly, in his deposition below, admitted that he lacked any evidence to demonstrate a genuine issue of disputed material fact on the three remaining claims against my client, fraud, aiding and abetting, and civil conspiracy. I don't have a lot of time. Wasn't there a battery claim as well? Excuse me? Wasn't there a battery claim as well? There was, but the direct claim for battery is against Mr. Lesner. My clients were only included through the derivative aiding and abetting. Got it. So, I don't have a lot of time. I won't go through everything, but a few highlights, I think, will demonstrate this fact. Let's start with fraud. Of course, it has to be proven by clear and convincing evidence. The first element of a fraud claim is that there has to be a material statement of, or a false statement of material fact. The evidence is undisputed that Mr. Hunt communicated solely with Mr. White regarding his participation in UFC 200 and regarding Mr. Lesner's drug testing. Well, Mr. Hunt alleged that he was misled regarding exactly when the fight with Mr. Lesner was finalized, when the UFC knew that Mr. Lesner would be the opponent for Mr. Hunt. What's your response to that? Sure. That's a great question, Your Honor. June 3rd was when Brock Lesner signed the bout agreement. That's not the question. The question is when was Mr. White aware that Mr. Lesner would be Mr. Hunt's opponent? Respectfully, Your Honor, Mr. White's testimony below, and there's no dispute on this because it also came from Brock Lesner's side and his agent, was that you don't have a fight until the bout agreement is signed because there are a lot of things that can go wrong during the negotiations. Well, did they tell him that they were negotiating with Lesner? They did not tell him. I'm trying to think. They didn't tell him that they were negotiating with Lesner. They were considering a number of opponents. Lesner wasn't the only opponent that they were considering. So they were negotiating with several possible opponents at the same time?  Correct. And it was not, and so if Mr. Hunt asked about that, they would not be willing to say who those people were? Right. Well, if you look at the direct messages between the parties, Mr. Hunt and Mr. White, there are a number of names that are being discussed. Mr. Hunt is asking for certain opponents. Mr. White is telling him that he's working on things. That's one of the things that Mr. Hunt complains about in his papers is he says that he asked on May 27th in the direct messages, who am I fighting? And that Mr. White said, I don't know. But that's not true. If you look at the direct messages, all of these are in the record. He asked, who am I fighting? And Mr. White said, I'm working on it. A 100% truthful statement because the contract was not done yet. Excuse me. Yes. So one of the issues is always the credibility of the party that's making the statement and whether those statements are true and whether they should be tested under cross-examination. So to say that something is not contested doesn't mean that it is true. So there may be a failure of proof. There may be no contrary evidence, but it doesn't mean as a matter of factual sort of perfection that something indeed is true. Do you understand the point? Well. So I took the argument a little bit to mean I didn't believe him. Shouldn't I be able to test that? Well, Mr. Hunt was asked repeatedly in his deposition, do you have any evidence that any of Mr. White's statements were untrue? And he answered no. But with respect to the identity of the opponent, I think something is very important. On June 4th, the bout was announced publicly. Mr. Hunt. Right, but my point is that you don't necessarily have to believe someone when they say this particular fact is true. Sometimes, you know, that assertion gets tested by cross-examination. But I made my point. Go ahead. Well, Mr. White was deposed when Mr. Hunt had counsel, and he was examined on that point. So he had the opportunity to test Mr. White's credibility in his questions and answers in a deposition. I've got six seconds left. Do you have any other questions? That's all right, because I do want to make sure that we air all of the issues. The other issue was the drug testing and the exemption. Those were a little troubling, I have to tell you. I thought the record reflected that Mr. Lesnar was the one and only recipient of such an exemption. Is my recollection of the record correct? You are correct, Your Honor. And so in view of the fact that Mr. Hunt had repeatedly expressed concern about whether or not Mr. Lesnar was taking some banned substances, was there any misrepresentation regarding the testing of Mr. Lesnar? I would say absolutely not, Your Honor. With respect to the four-month waiver, Mr. Hunt knew about that on June the 8th. He asked Mr. White about it. Mr. White explained the reason why it was given. And Mr. Hunt decided to fight. So at a minimum, there was no detrimental reliance. He was aware of that. There was nothing withheld. Now, he, in retrospect, I think, is questioning the reasons for why the exemption was granted. But there was no disputed evidence on this whatsoever. Mr. Nowitzki. Well, wasn't there some indication in the record that the four-month extension was convenient to allow any banned substances to be dissipated? Well, that's what Mr. Hunt is saying. But there is no evidence in the record to support that whatsoever. Why would there be this one-time exclusion that had never been done before, has never been done since? Isn't there an inference that can be drawn from that? Respectfully, I would say no, because Mr. Lesner was a unique situation, and this was part of the rationale not only decided by the UFC, but also USADA, the independent testing agency. And that was Mr. Lesner retired three years before the anti-doping policy was enacted by the UFC. And so when he came back, this was not a situation where the policy had been enacted. He retired to avoid having to be subjected to testing and then tried to come back. He was treated as a new athlete. Are there other new athletes that come into the UFC? Yes. And are they exempted? New athletes are not subject to the four-month testing requirement. Correct, Your Honor. They are not. That's why he was treated as a new athlete. The upshot was that. So you've never had anyone else that retired and came back? No. You'll see some evidence in the record. There was a reference to a fighter named George St. Pierre, another very prominent UFC fighter, that was going to potentially be in a similar situation to Mr. Lesner. He ended up not coming back. But it was contemplated that he may be in that same situation. But when this testing took place, why did Lesner get so many tests? Well, I think, you know, the fact— What was the purpose of that? I mean, did somebody ask the doping agency to test extra? There is no evidence in the record that anyone from the UFC did that. USADA is an independent testing agency. If you look at the anti-doping policy, it has exclusive testing authority. And so the UFC, I mean, if they wanted to tell USADA, hey, do this, do that, test more, test less, USADA wouldn't listen. USADA is an independent agency that decided when to test Mr. Lesner, how often to. Do they have standards? USADA does have standards, but I'm not—I can't sit up here and tell you what those standards are. We have no insight into the decision-making that USADA employs when deciding. You mean your organization wouldn't be aware of what the doping agency's policies are? Well, that's—we have our anti-doping policy. That's enacted by the UFC. It was done in conjunction with the World Anti-Doping Agency when we created it. And then USADA was retained to administer it as an independent body. But we don't have insight into what USADA's internal policies are other than we were aware that it was the foremost testing agency in the country. Well, Hunt seemed to know that something was up because he said something like he's being—they're testing the SHIT out of him. Mr. White said that. Oh, correct. Mr. White said that. Yes. So I understood your question to me. Do we know what their policies are? We are informed about testing that's taking place. No question about that. We have testimony from Mr. Nowitzki who was— Are all new athletes treated the same way? All new fighters? They're all subject to testing. But are they subjected to having— To the same amounts of tests? Yes. Your Honor, that's not our decision. That's up to USADA. Okay. But to clarify, and I don't want there to be a misunderstanding on the record, Mr. Nowitzki, our vice president and head of athlete performance, acts as a liaison between USADA and the UFC athletes. For example, there was testimony that Mr. Nowitzki went and met with Mr. Lester to educate him on what was going to be expected of him and what was required in terms of, for example, whereabouts testing. Whereabouts testing means you've got to provide information to USADA that they can find you 24 hours a day, 7 days a week, because if they want to show up and give you a random test, they need to know where to find you. Were the tests random for Mr. Lesner? Absolutely. I mean, again, we don't do the testing, but there is no evidence on this record whatsoever to indicate that there was something where Mr. Lesner got advance notice of testing. Absolutely not. If you look at the testimony from his agent, who's also an attorney, his name's Brian Stegman, he explained that he was the point of contact for USADA when they would want to test Mr. Lesner, because Mr. Lesner wasn't very technically proficient, so they wanted to make sure that we know someone we can call when we need to show up and test Mr. Lesner, which they did. Mr. Lesner actually ended up testing positive for banned substance, correct? He did. The record, and this is undisputed, the record is that Mr. Lesner was tested nine times. The first six tests all came back negative. Those tests were respectively on June 8th, June 15th, and June 16th. He was given blood and urine tests on each of those dates. Then he was tested again on June 28th and on July 9th, fight night. The tests from June 28th and July 9th were the ones that came back negative, but nobody knew that until after the fight. Negative, positive. Excuse me, positive. I apologize. Nobody knew that until after the fight. The results from USADA came back on the 15th of July and on the 19th of July, and the documentary evidence that's in the record showed that the UFC did not know that until USADA told them. Mr. Hunt was on to something. He expressed fear that Mr. Lesner would be drugged, taking banned substances, and actually it ended up that he was tested positive for a banned substance. Well, I don't know that I can agree with the statement that Mr. Hunt was on to something, but what I would say is. . . Well, what he feared came to pass. Mr. Hunt. . . Correct. What he feared came to pass. He feared that he would be. . . Tested positive for a banned substance. Now, I will say that Mr. Hunt's focus was on him testing positive for steroids, and that is not what he tested for, but. . . Well, but there's a link to steroid use. At least in the record, there was some suggestion that the banned substance that was found is one that is associated with the use of testosterone. It's a way to generate testosterone in the body. That was the testimony, Your Honor. Right. Anything else I can answer to clarify? I'm way over my time, but I'm happy to stand up here and answer whatever questions you have. Well, I just wanted to make sure we fleshed out everything, because Mr. Hunt is appearing a pro se, and I wanted to make sure that we asked all the questions that we had, so as the record will be clear about what happened, what his claims were, and what the response is. As I understand from reading the briefs and thinking about the case and looking at what we did before, your whole position is that there were no false statements. There were no misrepresentations, period. Well, there were no. . . But there's stuff in the record, as Judge Rawlinson was just saying here, that one could draw an inference that there was a false statement. Well, Your Honor, I would disagree with that. I do not believe that to be the case, but if we're talking about Mr. White's statements, I think the district court judge went through the record meticulously, looked at all of Mr. Hunt's theories, whether we were talking about affirmative misrepresentations, alleged omissions. She went through everything and looked at the documentary evidence and the testimony of the various witnesses and found there were no genuine issues of disputed fact and that all of his statements were, in fact, true. But that wasn't the only basis for the fraud claim. It's the only one I referenced because I thought I only had five minutes, but she also found that Mr. White . . . You have as long as we need to. A hundred percent. I'm not looking to get out of here. I'll stay as long as you want. But in addition to that, she found that Mr. Hunt nor the UFC did not know that any of the statements made were false, which is another element of a fraud claim. Also found that Hunt's reliance was not reasonable and that there was no detrimental reliance because Mr. Hunt would have done the same thing regardless of any alleged misrepresentations. But that's a conclusion. We don't know if that's true. Mr. Hunt said that, but, you know, it's a business of puffery and bravado. So I don't consider that type of evidence to be particularly persuasive. What I would say in response to that, Your Honor . . . Do you understand what I'm saying? I understand exactly what you're saying. Okay, thank you. But what I would say in response, if I might, is that there were two sets of statements that were being analyzed that Mr. Hunt was making on this issue. Some were public to the press, to the public, to promote the fight, the smack talk argument. Many, if not most, of his statements were made privately to Mr. White. But he was saying the same thing. Still the same principle. He's, you know, you just said he's, you know, a fearless man, and so he's trying to portray that image whether it's in private or in public. That's his image, and that's what he's going to portray about himself. So the fact that it was in private doesn't take away from the bravado character of them. Your Honor, that certainly, I'm not going to argue with that view. I would differ with that. But I'd like to close, if I could. Can I just say, I think the argument would be that it's not strictly bravado at that point, but it's a desire to communicate to your client that Mr. Hunt needs this fight and is willing to go along with it even though he has serious doubts. So it's sort of a first cousin of bravado. Well, let me say there's a very important point that I think addresses that, and I want to make sure that this is clear. Mr. Hunt acknowledged, and there is no dispute in the record about this, Mr. Hunt did not have to take this fight. Mr. Hunt did not have to fight Brock Lesnar. He didn't have to fight at UFC 200. Fighters are offered fights. They decide if they want to take them or they don't. He did not have to take the fight. He was under no pressure. There would have been no consequence. But his point was that he wanted to take the fight, but he wanted to fight an opponent who had not been taking drugs. So it wasn't an issue of whether he wanted to take the fight or not. It was he wanted to confirm that the person he was fighting would not be juiced in his terms. Understood. But, Your Honor, if he was concerned about Brock Lesnar, and whether you consider it puffery, smack talk, or whatever, being made publicly or privately, if he had those concerns and that was what was determining whether he wanted this, he didn't have to take the fight. When was the last time he could have withdrawn from the fight? Well, that's a great question because withdrawn probably right up until the fight itself because remember what also is undisputed in the record. This was not supposed to be the headline fight by itself. That was supposed to be a fight between Jon Jones and Daniel Cormier. Jon Jones tested positive for a prohibited substance three days before the event, and we didn't have to wait to decide what do we do with Jon Jones. The UFC yanked it. That's done. There is no benefit to the UFC to having fighters who are alleged to be doping or actually are doping fight in their events. That is not something we want. And so when Jon Jones tested positive three days before the event, that event was yanked from the card, and Mr. Hunt and Mr. Lesnar's event was elevated to the top of the card. So right up to the eve is the answer to your question, Your Honor. There was some suggestion in the record that if Mr. Hunt had not taken this fight, then he would be less likely to be chosen for future fights. Well, I think the only evidence I saw of that in the right, and I'm going to use quotes for evidence, came in the reply brief, Your Honor, in which Mr. Hunt citing to non-record evidence was referring to a video that his lawyer put on her website talking about the fact that if Mr. Hunt didn't take a certain fight, then he was going to be deemed to be in breach of contract. Now, that's nowhere in the record at all. And so I don't know if that's where you're getting that, but the unequivocal testimony that's in the record is he could have rejected the fight without consequence because, remember, this was the first fight of a six-fight deal. And so whether he fought Lesnar or he didn't fight Lesnar, he was still going to be under contract for six fights. And he got paid, you know, the same amount, regardless of whether he won or lost, which is an important point. So the fact that it was originally a loss to Lesnar didn't mean any difference in money to Mr. Hunt. He got paid the same amount. But the same is true with all of his fights going forward. He had five more fights. His purses went up each fight. He fought all those fights. We paid him for all those fights. So there were no damages from a contractual standpoint at all, which I think is an important point for me to close with, unless you have more questions, which is a very important issue that the district court did not reach, but I think this court can, and I would recommend to consider it closely, is there are no genuine issues of disputed fact regarding his damages. You remember the last time we were together, and in the resulting opinion, one of the things this court said is that it might be conceivable that expert testimony could show that a withdrawal would be better than a loss. We put those questions to Mr. Hunt and his experts, and he admitted he did not lose any fans. In fact, he admitted that in a competitive loss, you can gain fans. And he admitted that that had happened to him before in the fight with Bigfoot Silva. Mr. Silva tested positive for elevated testosterone. It was a magnificent fight by everyone's account, and Mr. Hunt acknowledged I gained a lot of fans from that fight, even though it was a no contest, just like this. No lost appearances, no lost licenses. All of the things that this court posited may be possible back on the record after we do discovery and with expert testimony and testimony from everyone else, it doesn't exist. It's nowhere in the record because Mr. Hunt acknowledged he had no evidence of any damages. All right, thank you, counsel. Any other questions? Well, you forgot one point, if I may. I'm so sorry. I'm not trying to throw a softball, but I don't believe Mr. Hunt testified that he suffered any incrementally worse injuries as a result of this fight. Well, that's exactly right, too, Your Honor, and I'm sure Mr. Olson will have something to say about this in the context of the battery claim, but we took Mr. Hunt through what do you expect to happen in a UFC fight. You're going to get hit. You're going to get punched. You're going to get taken to the ground. That is the essence of the sport is to batter each other, and he testified that everything he expected is exactly what happened, including being seven years later saying the fight was great, the fight was even, and he was incredibly dismissive of Brock Lesnar's punching power, which I think dispels the notion that he was supercharged and, you know, all the things. Is there any evidence in the record that the chlorophene? Is that what it's called? Chlomapine. Chlomapine.  That it enhanced his strength or his strength or endurance ability? The closest, and I think the district court pointed this out, the closest Mr. Hunt got to having any evidence on the effect of a performance-enhancing drug was from his expert, Mr. Isratel, who was like a school coach, and all he did is not in the context of Mr. Lesnar. He kind of offered an opinion on the effects of steroids and anabolic steroids, but there is no record evidence that chlomapine had any impact on Mr. Lesnar's performance at UFC 200. None. All right, thank you. Thank you. Thanks so much. All right, Mr. Olson. We won't keep you as long. All right. Good afternoon, and may it please the court. David Bradley Olson on behalf of Brock Lesnar. We need to keep in mind here that Mr. Hunt is required to prove fraud by clear and convincing evidence, and he's required to prove lack of consent as an essential element of his battery claim. But the two claims are inextricably intertwined because, number one, Mr. Hunt unequivocally consented to a professional mixed martial arts fight with Brock Lesnar. Well, in all fairness, his position is that he consented to fight someone who had not ingested any banned substances, and if, in fact, he was fighting someone who had ingested banned substances, there was no consent. Well, what he consented to was a fight with Brock Lesnar, and the only stipulation, if there was a stipulation, is that Mr. Lesnar be tested. Well, the law doesn't say that, but battery is, I mean, consent to a battery would be consent to, he put a condition on his consent, so why doesn't that refute the consent argument? Well, first, the only condition, which I was just mentioning, is that Mr. Lesnar be tested, which he unquestionably was. The record is absolutely clear on that. He was tested nine times, and if you look at the direct messages between Mr. White and Mr. Hunt, all of those direct messages deal only with, I want to see that he's tested. I want him treated like everybody else. Well, he was. That's the only condition that Mr. Hunt ever put on a fight with Mr. Lesnar. So he did consent to an MMA fight where fighters intend to batter each other, and his consent is vitiated only if he was somehow defrauded into accepting a match with an opponent who was knowingly and willfully and intentionally doping, and then who lied and tried to cover it up, which brings us back to the elements of the fraud claim, which Mr. Hunt. Could you clarify one thing for me in the record? Yes, sir. There was the bout agreement with UFC, right? Mr. Hunt signed a bout agreement with the UFC, and Mr. Lesnar signed a separate bout agreement with the UFC. Was there like a side agreement or a specific agreement dealing with the fight with Lesnar? I'm not sure I understand that question. Well, I mean, was there a separate agreement, say, now on such and such a day you're going to fight Lesnar? That's what the bout agreements are. The bout agreement Mr. Hunt signed said I would do it. But this bout agreement is for all the fights he was going to do for. That's a promotional and ancillary rights agreement I believe you're talking about. That's a broader agreement like Mr. Hunt's agreement to have six fights, successive fights. But any individual fight requires a separate bout agreement signed just for that fight. So every fight that he undertook with UFC, there's a separate? A separate bout agreement for a separate opponent, correct.  Were there any modifications to this agreement? Not that I know of and not that the record shows. Did Mr. Hunt ask for any? Well, I asked him that more than once during his deposition and several times during the written interrogatories and requests for admission, and his answer was consistent every time. No, I never asked for any change or amendment to any agreement. The only communications he had with UFC or Mr. White are those direct messages that are all part of the record, and those communications state only I want to see Brock Lesnar tested just like everybody else. Well, in our prior decision we said that doping is not within the normal scope of organized MMA activity. So he could not have consented to fighting someone who had banned substances in their system. What's your response to that? That's not what he would consent to because that's not within the scope of MMA. Co-counsel just said that MMA does not want people fighting who have banned substances in their system. So how could he consent to fighting someone with banned substances in their system? Well, he consented to an MMA fight. But that does not include fighting someone who has ingested banned substances. We said that in our last decision. He consented to an MMA fight knowing that fighters oftentimes sign about agreements which say that they'll abide by the anti-doping policy and then fail a test. He knew that going in. That's not what we said in our decision. We said that he could not consent to that as part of the MMA fight because doping is not within the normal scope of organized MMA activity. So that would not be included within the scope of consent for MMA activity. But his claim is that he consented to fight Brock Lesnar and that he was duped into, he was defrauded into fighting a doping fighter. That's the fraud claim. I'm talking about the battery claim. That's what I was talking about, how the fraud and the battery claims are intertwined because we know he consented to an MMA fight with knowledge that MMA fighters oftentimes fail drug tests. That's not what we said. But that's inconsistent with what we said in our opinion. We said that that's not within the scope of MMA activity. I understand what your opinion said. That's the law for this case. Which was on a 12B6 motion. But now we have evidence. We have facts. That doesn't change the ruling that consent cannot be for an activity that is outside the normal scope of MMA activity. So you're telling us that, in other words, he consented to fight with someone who could have been under the influence of a banned substance. He consented to that. I'll concede that he did not consent to fight someone who knowingly, intentionally was doping and was supercharged with superhuman strength. Not supercharged. If they had been using a banned substance. You're saying that he consented to fight someone who had been using a banned substance. He did. The only stipulation he put on it was that there be testing. There was testing. Ultimately, a test was failed. But he did consent to fight Mr. Lesner knowing, believing, suspecting, and telling everybody that he was doping. He did not consent to fight someone who had been using a banned substance. The fact that he signed an agreement to fight an MMA does not incorporate consent to fight someone who's been using a banned substance. But let's look at the facts here because Mr. Hunt got exactly the kind of fight that he signed up for. Can I follow up? So I think that what I'm hearing has a little bit of traction in my mind. So I think we need to explore it. If you assume hypothetically that Mr. Hunt, the scope of his consent was only to fight a clean fighter, regardless of whether the test, the dirty test, comes back on the day of the fight, after the fight, and it's later determined that your client had a banned substance in his body, just put all of that aside, assuming if it's true, just assume this hypothetical that he did not consent to fight someone who had a banned substance in their body on the day of the fight, just as a hypothetical, doesn't that mean that Mr. Hunt's battery claim should survive? Not at all. If that hypothetical is true. Not at all because that would make this a strict liability claim, which it isn't. The battery is an intentional tort. Mr. Lesner had to have been found to have intended to violate the anti-doping policy when he signed that agreement. But your defense was consent. That's the fraud part of it. We're talking about the consent to battery. Forget fraud. You say they're inextricably intertwined. I'd have to think about that. I'm not sure. But if the consent indeed is that the opponent will have no banned substance in their body on the day of the fight, just construing it narrowly, how can the consent be valid, period? Because battery is an intentional tort, and that would convert a battery to a strict liability offense. It would if the scope of the content—you're exactly right. It would. It would do that if the hypothetical is true and there would be no consent to the battery. So the if is important, and it's something I'd have to think about. But if my hypothetical is true, then I don't see how you avoid the conclusion that the battery was not consented to. Other than your hypothetical is different from the facts of this case. That could be. So I simply was using that as a way of sort of testing the structure that we're discussing. And if I could just clarify one thing. There's been a lot of talk about failing drug tests and taking drugs and being found with drugs in your system. The facts here are that Mr. Lesner was found to have an adverse analytical result, and that result was for nanogram levels of clomiphene in the system. A nanogram is a billionth of a gram. But there were consequences to that. It was deemed to be serious enough that the Nevada Athletic Commission took action, correct? Because that is a strict liability regime. If you're found with one nanogram in your system, you fail a test.  We have somebody who was with banned substances. That's the historical fact. Yeah, let me ask you just a few questions about the drug testing results. So there were nine tests of Lesner, correct? Yes. And the first six came back negative. That's correct. Okay. When did UFC or Mr. Lesner learn that they'd come back negative? No one at UFC knew, and Mr. Lesner did not know, that there would be an adverse analytical result until July 15th. That wasn't the question. No, no, yeah. So I'm just talking about the first six. The first six? Yes. I don't have the exact dates in mind, but one was reported two or three weeks before the fight, and the other was about a week before the fight. And those reports, when you say were reported, were reported to UFC? Reported by USADA to UFC and then reported to Mr. Lesner. You've passed your test. It's negative. Okay. So then there were three more tests, correct? There was a seventh test. There was a blood and urine test on the same day, June 28th, and then there was another test on the day of the fight, July 9th. And those are the ones, those last three, those are the ones that came back positive on July 15th. On July 15th, and that was after the fight. I think after the fight, correct. So there's no evidence that anybody knew Mr. Lesner would fail a test. There's no evidence that Mr. Lesner ingested any banned substance intentionally or knowingly or that in any way tried to game the system or to cheat. That's all pure speculation. Do you know where it is in the record where it shows that before the fight, the last test, the sixth test, or one of the other tests, that demonstrates or shows that UFC knew that the test results had come back negative? I can't point to exactly where in the record, but I know it's in the briefing and in the supplemental excerpt of record. Are you sure? I'm quite certain of that. Okay. Okay, thank you. I don't have anything else. All right, thank you, Counsel. Thank you, Your Honor. Mr. Hunt, you have five minutes. Yes, Your Honor. Could you address the consent issue, the fact that counsel for Mr. Lesner says you consented to fight Mr. Lesner knowing that there are instances when MMA fighters have ingested banned substances? What's your response to that? My response to that, when Lesner's lawyer suggests I consented to a fight a steroid user, I had several agreements in place that I should have been allowed to rely on. That included the anti-doping policy. I also continually relied on White's reassurances that Lesner would be cleaned. Can I ask a question? Of course. Mr. Hunt, how were you hurt by any of this? Let's just assume that you're right on some of the theories. Let's assume you're right on your battery theory. How were you hurt financially or otherwise? And you have to reflect, you have to answer that based upon what's in the record before us. Okay, I'm just going to grab my energy drink. By hurt, I mean damaged. How were you hurt financially and physically, period? How were you hurt? My career was halted. Every time I fought a steroid user, it always becomes a non-contest. I don't move forward up in the ranks. I think I was ranked number five in the world at the time. But every time I've fought a guy that's been doping, like, for instance, I broke my hand in 16 screws with another doping opponent. I've got knocked out by another doping opponent. But, right, we're talking about this one, this one. How were you hurt on this one? Well, like I said, my career is halted. I don't move forward in the ranks. It becomes a no-contest, a blemish on my record. I'll just get my damages. Sorry, I was just sick and just grabbed my damages. You know, I've got the intimidation by Colby Williams of my partner, the stalking of my partner. It's all in the briefings. This is my future earnings, emotional distress, coercion, battery. You say your future earnings, but what is in the record that answers that question? Well, every time I've lost a fight concerning a doper that my company doesn't look out for me and it doesn't get penalized properly, I really said I'm not able to move up, but also my fire, like I said, for wanting to fight, to fight for the world title, it gets dissipated. Is that what you're asking, Your Honor? Yeah, I'm just trying to understand in concrete terms. You know, people go to court, they sue, they usually want money. Well, I mean, this is a civil case. Sorry. Yeah, go ahead. That's it. I mean, this is a civil case. Williams' attempts to narrow the harm's evidence wasn't presented. In fact, the expert report from Dr. Carrie Hastings was presented and stipulated with a medical diagnosis. That's in the facts. That's in the records. Okay, thank you. The opposing counsel said you had the remaining fights that were on your contract. This was the first, and that you had the remaining fights. Is that true? Well, not all of them I had. I got pulled off Sydney, the card. They alleged that I had CTE. I had to go get checked. The rest of the fights I had, yes. Is there anything else you'd like to add before we conclude? I'd like to add... Let me just get this out of the way. I'd like to add on the fraud, the false statement of material effect, we refute these claims. The phone messages show that Elizabeth Ann White did know from March 2016. That he would be the opponent. When White was deposed, he answered that he didn't know about the exemption. This perjury is in opposition to the existence of material evidence that was produced in discovery. And contrary to Mr. Williams, has stated today that his answering brief admits that I was defrauded and harmed by collusion, fraud, and aiding and abetting. Just to highlight some of the admissions, they even highlight that just because I was harmed, maybe White didn't know about it. Harm exists whether White wants to suggest it or not. Whether he knew or not. Also, further, I like the defendant's comments when Lesnar tested positive. It was USADA contracted to the USC, performing the test I relied on. Also, as you commented on the false statements, I point again to the defendant's answering brief. Where the defendants have in fact made admissions to their collusion, fraud, aiding and abetting, and that should Mr. White have contributed to committing the harm. When Williams suggests... When Williams suggests that I didn't have to take the fight, I have been coerced into fight on other occasions with threats that I will be in breach of my contract. Irrespective of when I have been coerced, I have evidenced this with a documentary with my former counsel that stated, William attempts to narrow the harms evidenced. Wasn't presented, in fact, that was the expert report by Dr. Carrie Hastings. A comment regarding the clomiphene found in Lesnar's system is known to be a steroid clearing chemical. When Lesnar's lawyer suggests that I consented to fight a steroid user, I have several agreements... Anyway, yep, that's... I like... That's basically... Whatever, but... All right, thank you. Thank you, Mr. Hunt, and thank you for appearing from Australia. That completes our case for today. The case just argued is submitted for decision, and we are adjourned. All rise.  This court for this session stands adjourned.
judges: PAEZ, RAWLINSON, Pregerson